UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JAY BRADLEY MORRIS**,　　　　　　　　　　Case No. 4:12 CV 1767

　　　　Plaintiff,　　　　　　　　　　　　　　Magistrate Judge James R. Knepp II

　　v.　　　　　　　　　　　　　　　　　　　MEMORANDUM OPINION AND
　　　　　　　　　　　　　　　　　　　　　　ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

　　　　Defendant.

## INTRODUCTION

Plaintiff Jay Bradley Morris seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and 1383(c)(3). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 17). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

On September 25, 2010, Plaintiff filed applications for DIB and SSI claiming he was disabled due to left hip pain, arthritis, and depression. (Tr. 176-85, 243). He alleged a disability onset date of October 23, 2005. (Tr.176). His claims were denied initially (Tr. 87-92) and on reconsideration (Tr. 93-98). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 113). Plaintiff (represented by counsel), a vocational expert (VE), and social worker Ken Woods testified at the hearing, after which the ALJ found Plaintiff not disabled. (*See* Tr. 14, 34). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final

decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On July 10, 2012, Plaintiff filed the instant case. (Doc. 1).

Plaintiff filed previous applications for DIB and SSI on April 19, 2007. (Tr. 17). These claims were denied initially on August 28, 2007, and on reconsideration December 27, 2007. (Tr. 17). Plaintiff did not request a hearing. (Tr. 17). At the ALJ hearing in the instant case, Plaintiff requested the prior applications be reopened. (Tr. 17). The ALJ denied the request because Plaintiff failed to show good cause as required by the regulations. (Tr. 17); *Anderson v. Comm'r of Soc. Sec.*, 195 F. App'x 366, 369 (6th Cir. 2006) (Federal courts do not have jurisdiction to review an ALJ's decision not to reopen a prior application absent a colorable constitutional claim.). Since Plaintiff has not asserted a constitutional claim, the prior determinations are final, and the relevant time period for this case begins on December 28, 2007. (Tr. 17).

**FACTUAL BACKGROUND**

Personal and Vocational History

Born June 21, 1960, Plaintiff was 50 years old at the time of the ALJ hearing. (Tr. 18, 41). Plaintiff completed high school and spent two years in vocational school for small engine repair and agricultural mechanics. (Tr. 248). His past work experience included line worker, car washer, laborer, and press operator. (Tr. 225, 250). Plaintiff's wife died in 2006 and he lived in an apartment with his 19 year old daughter. (Tr. 42). Plaintiff took care of a cat, a spider, and a turtle. (Tr. 61).

During the hearing, Plaintiff testified he cut an elderly man's grass once a week using a push mower. (Tr. 49). He said it took him an hour with one fifteen minute break. (Tr. 49). He said he had constant pain in his hip, and intermittent pain in his lower back and neck. (Tr. 53). He testified Aleve helped his pain. (Tr. 53). In a disability report, Plaintiff said his hip and back problems caused him

excruciating pain when standing or walking up and down stairs. (Tr. 243). He said he could not bend, stretch, or stand for any period of time. (Tr. 243). He also said he suffered from depression and experienced good and bad days. (Tr. 61). On bad days, Plaintiff said he would sit around and not eat right. (Tr. 61). Plaintiff also claimed he heard voices and said his deceased wife tried to contact him via cell phone. (Tr. 61-62).

Ken Woods, Plaintiff's case manager at Columbiana County Mental Health Center testified Plaintiff said he heard voices and claimed his deceased wife tried to contact him through his cell phone. (Tr. 65). He said Plaintiff stopped taking his medication at times, which caused overwhelming distress. (Tr. 65). Mr. Woods also testified Plaintiff did not have the ability to function or hold down gainful employment, even on medication. (Tr. 67-68).

Medical Evidence - Physical Impairments

On October 29, 2008, Plaintiff saw Dr. Lakhani for a consultive examination. (Tr. 380-83). Plaintiff reported the only medication he took was over the counter Rolaids. (Tr. 380). He said he quit his job washing cars in February 2007 because the company was sold. (Tr. 380). Plaintiff explained he twisted his back on the job in 1999 while pulling a 40 pound steel bathtub onto a roller. (Tr. 381). Since then, he said he had lower back pain about four to five times per week. (Tr. 381). He also experienced pain while bending or carrying 20 pounds of groceries up the stairs to his apartment. (Tr. 381). He had hip pain mostly in the morning or after sitting for fifteen minutes. (Tr. 381). He said he could walk three blocks before stopping, stand ten-to-fifteen minutes before resting, and carry 20-30 pounds for short distances. (Tr. 381). Plaintiff reported no history of anxiety, depression, mental illness, or hallucinations. (Tr. 381).

On examination, Plaintiff's gait and ambulation were normal without the use of ambulatory

3

aids. (Tr. 381). Straight leg testing was normal but there was moderate tenderness in the left lumbosacral area, and lumbar flexion was limited secondary to lumbar pain. (Tr. 382). Plaintiff had no muscle wasting or sensory loss and deep tendon reflexes were 5/5 in the upper and lower extremities. (Tr. 382). An x-ray of Plaintiff's hip showed well maintained joint spaces but mild sclerotic changes in the acetabulum. (Tr. 382). An x-ray of his lumbosacral spine showed minimal degenerative changes on L4, tiny spur formations on L3, and first degree spondylolithesis on L5-S1. (Tr. 382). Dr. Lakhani found Plaintiff's left hip and lumbar pain were possibly due to degenerative joint disease. (Tr. 383). He found Plaintiff's memory, concentration, and understanding were good. (Tr. 383). Functionally, he found Plaintiff could possibly walk three blocks and carry 20-30 pounds for short distances. (Tr. 383).

In December 2008, state agency physician Anton Freihofner, M.D., assessed Plaintiff's physical residual functional capacity (RFC) and concluded he could lift up to 50 pounds occasionally and 25 pounds frequently, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (Tr. 417-24). As support, Dr. Freihofner cited diagnostic studies and clinical findings contained in the record. (Tr. 418). He specifically found Plaintiff could perform medium duty work with frequent postural limitations. (Tr. 418-19). State agency physician William Bolz, M.D. affirmed Dr. Freihofner's assessment on April 3, 2009. (Tr. 429).

Physical therapist Brian Rafferty saw Plaintiff at Salem Community Hospital (Salem) for a Functional Capacity Evaluation (FCE) on December 3, 2008. (Tr. 437-43). Plaintiff reported "having more difficultly performing manual labor jobs due to his chronic back and left hip pain and increasing weakness." (Tr. 437). Mr. Rafferty concluded Plaintiff demonstrated poor tolerance for

sustained activities, dynamic lifting, and pushing and pulling, and his overall strength and endurance was limited by complaints of pain, fatigue, and decreased balance. (Tr. 437). He found Plaintiff could perform light and sedentary work according to Department of Labor standards. (Tr. 437).

On March 11, 2010, Plaintiff sought treatment at Salem for indigestion and a skin lesion on his forehead. (Tr. 447). On examination, Plaintiff had no back pain, joint stiffness, joint swelling, or swelling of extremities. (Tr. 447). Plaintiff had a normal gait, posture, and sensation in his upper and lower extremities. (Tr. 449). A month later, Plaintiff had surgery to remove the skin lesion on his forehead, which was diagnosed as basal cell cancer. (Tr. 451).

Plaintiff sought routine care at Lisbon Community Health Center (Lisbon) in 2010. (Tr. 455-56, 458-63). He was treated for gastroesophageal reflux and skin cancer on his scalp. (Tr. 455, 460). On November 15, 2010, Dr. Cola noted Plaintiff had more energy and was feeling better, and overall Plaintiff said he was doing well. (Tr. 455). Dr. Cola remarked, "He had his social worker in the office with him [] and the social worker did not voice any concerns or have any problems either." (Tr. 455). He addressed Plaintiff's medical conditions – gastroesophageal reflux, hypertension, tobacco abuse, depression, and routine health maintenance – and instructed Plaintiff to follow-up in five months. (Tr. 456).

Medical Evidence - Mental Impairments

Plaintiff saw treating psychiatrist Madhubala Kothari, M.D., in January 2008. (Tr. 375). She noted Plaintiff "seemed to be doing fine in terms of mood, affect, and behavior except [] he occasionally fe[lt] sad and depressed." (Tr. 375). Notably, Plaintiff had stopped taking his prescribed antipsychotic medication Risperdal. (Tr. 376). At Plaintiff's next appointment in April 2008, Dr. Kothari indicated Plaintiff was "doing fine" in terms of mood, affect, and behavior. (Tr. 375). He

5

was on Lexapro and was instructed to follow-up in two-to-three months. (Tr. 376).

In March 2008, Plaintiff saw psychiatrist Evelyn Abramson, Ph.D. (Tr. 367-68). She refused to fill out a mental capacity report because she had not seen Plaintiff since October 2007. (Tr. 365-66). She indicated Plaintiff's goal was to look for a job he would be content with, continue appointments with mental health professionals, and take medication. (Tr. 369). The plan included visiting a temporary agency to "seriously" review available jobs. (Tr. 368).

On June 28, 2008, Plaintiff's social worker Ken Woods reported he attempted to meet with Plaintiff for a psychiatric visit at Plaintiff's apartment but he was not there. (Tr. 379). Mr. Woods contacted Plaintiff's friend "due to the importance" of the visit. (Tr. 379). Plaintiff's friend reported Plaintiff planned to meet with Mr. Woods but he was out performing odd jobs. (Tr. 379). His friend also indicated Plaintiff was "managing well" and had no current issues or concerns. (Tr. 379). In September 2008, Plaintiff was seeking employment and planned to contact a vocational resource for employment assistance. (Tr. 367).

On November 17, 2008, Plaintiff underwent a consultive examination with psychologist John J. Brescia, M.A. (Tr. 388-98). When questioned about his alleged disability, Plaintiff said he had a "bad left hip" and some type of mental disability. (Tr. 389). He remarked, "Things go through my head at times. I get depressed." (Tr. 391). Plaintiff said he was not taking any medication because he "read up" on the negative side effects, but he was involved in outpatient treatment at Columbiana County Health Center. (Tr. 390-91). At the time of the evaluation, Plaintiff was not taking any medication for physical or mental impairments. (Tr. 390). Plaintiff reported he drank heavily after his wife died in 2006, consuming at least a case of beer a day, but said he stopped drinking a few weeks ago. (Tr. 390-91). He said he sought treatment for alcohol abuse in 2005 but "failed the

6

program." (Tr. 391). He indicated he would be "be fine" for awhile, but eventually resumed drinking. (Tr. 391). Plaintiff said he had never been hospitalized for psychiatric reasons but received outpatient mental health treatment at Lisbon on and off over the years. (Tr. 390). He reported he last worked in spring 2008, detailing cars at a car dealership for about eight months. (Tr. 391).

On examination, Plaintiff was clean, adequately groomed, polite, and friendly, but appeared somewhat uncomfortable. (Tr. 392). Plaintiff said he was currently depressed, mainly because he could not find a job and "hated sitting around." (Tr. 392). Plaintiff said he never experienced suicidal ideation but had crying spells when his wife passed away. (Tr. 392). His appetite was good and he had no trouble sleeping. (Tr. 392). Plaintiff said he did not think people were out to harm him and he never imagined things were happening that were not real. (Tr. 393). Dr. Brescia noted there was no indication Plaintiff had delusional thinking or a thought disorder. (Tr. 394). Plaintiff reported having poor memory, but acknowledged he experienced blackouts because of drinking. (Tr. 394). Dr. Brescia noted Plaintiff described "what appeared to be a serious chronic drinking pattern" and his behavior reflected poor judgment. (Tr. 395). Plaintiff exhibited low average cognitive functioning. (Tr. 395).

Concerning daily activity, Plaintiff said he watched television, occasionally went fishing, went on walks, and engaged in "job hunting." (Tr. 395-96). Plaintiff indicated he visited an "older gal" at an office supply store. (Tr. 395). He sometimes helped her in the store and they would get together and talk. (Tr. 395). He could not drive but he grocery shopped independently, went to a local church for dinner every Thursday, and did chores when he was "mentally able." (Tr. 396). Plaintiff remarked he was "usually lonely and bored." (Tr. 396).

Dr. Brescia diagnosed depressive disorder, not otherwise specified, alcohol dependance, in

early remission, and assigned Plaintiff a global assessment of functioning (GAF) score of 55[1], indicating only moderate symptoms. (Tr. 397). He said Plaintiff had moderate limitation in his abilities to relate to others; understand, remember, and carry out tasks; maintain attention, concentration, persistence, and pace; and withstand the stress and pressures associated with day-to-day work activity. (Tr. 397-98).

A week later, state agency psychologist Karla Voyten, Ph.D., assessed Plaintiff's mental functioning. (Tr. 399-415). Dr. Voyten summarized Plaintiff's medical evidence and concluded he retained the mental capacity to understand, recall, and follow simple instructions in the workplace, with only superficial social contact, and no pressures to perform rapidly or under strict production deadlines. (Tr. 415). State agency psychologist David Dietz, Ph.D. affirmed Dr. Voyten's assessment in March 2009. (Tr. 428).

Plaintiff continued treatment and medication checks with Dr. Kothari from March 2009 through November 2010. (Tr. 481, 494, 503, 516, 536, 552, 562, 575, 586). Generally, Dr. Kothari reported Plaintiff was "doing fine" with respect to mood, affect, and behavior. (Tr. 481, 494, 516, 552, 575, 586). Plaintiff also rarely reported new symptoms or complaints and his appointments were generally unremarkable. (Tr. 494, 516, 536, 552, 575, 586). On September 3, 2009, Plaintiff reported financial difficulties. (Tr. 562).  On August 10, 2010, Plaintiff reported the radio turned on at unusual times and he believed deceased people were trying to reach him via cell phone.  (Tr. 503).

---

1. The GAF scale represents a "clinician's judgment" of an individuals symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A higher number represents a higher level of functioning. *Id.* A GAF score of 51–60 reflects moderate symptoms (e.g., flat effect and circumstantial speech) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34.

Dr. Kothari encouraged him not to place much emphasis on these instances and to unplug the radio. (Tr. 503). In November 2010, while Plaintiff was "doing fine", he had stopped taking his medication. (Tr. 481). He was advised to resume taking his medication and to follow-up with his primary care physician. (Tr. 481).

Plaintiff also saw his case manager Ken Woods on a regular basis from February 2009 through January 2011. (Tr. 471-593). Generally, these notes reflected Mr. Woods helped Plaintiff arrange treatment for his skin lesion (Tr. 513, 522, 533-34, 547-49); complete housing paperwork (Tr. 482-84, 486, 488-90, 498-500, 556, 559-60); and deal with anger concerning acquaintances who received benefits when Plaintiff did not, despite doing "all the right things." (Tr. 556-558, 584). Plaintiff's alcohol use and side effects were also discussed. (Tr. 528, 585, 587).

The notes revealed a dramatic fluctuation in Plaintiff's depressive symptoms. At times, Plaintiff had symptoms (Tr. 544, 555), other times he had no symptoms (Tr. 579) or was stable (Tr. 589), and other times he went fishing with his father and helped him with yard care (Tr. 570). Treatment notes also documented Plaintiff's job seeking activity. (Tr. 582, 589-90, 592). Plaintiff did not elaborate on the "odd jobs" he performed but notes indicated Plaintiff had back pain after he helped a friend "stain a deck". (Tr. 578). Plaintiff admitted to purchasing beer when he received money for an "odd job" once. (Tr. 587).

VE Testimony and ALJ Decision

At the hearing, the ALJ asked a VE to assume a hypothetical person of Plaintiff's age with the same education level and work experience who had the following limitations: ability to perform light work with occasional postural movements including balancing, stooping, kneeling, crouching, crawling, climbing ramps/stairs; inability to climb ladders/ropes/scaffolds; a sit/stand option, without

9

going off task; simple, routine, repetitive tasks; low stress environment, with only occasional decision making or changes in the work setting; no production rate or pace work; and only occasional interaction with the public, co-workers, and supervisors. (Tr. 73). In response, the VE testified such a person could not perform Plaintiff's past work but could perform a number of jobs existing in the national economy, including house cleaner, inspector/hand packer, and hand washer. (Tr. 73-74).

The ALJ then asked if the hypothetical person could perform jobs in the national or local economy with the restrictions present in physical therapist Brian Lafferty's FCE. (Tr. 73-74, *referring to* Tr. 437-43). The VE responded such an individual would not be able to work because of lack of tolerance for sustained activity. (Tr. 75). The ALJ then asked the VE about customary tolerances for being off task in addition to regularly scheduled breaks, and what would happen if those tolerances were regularly exceeded. (Tr. 75-76). The VE testified exceeding the customary tolerances would likely not allow for competitive employment. (Tr. 76).

On March 7, 2011, the ALJ found Plaintiff had the severe impairments of degenerative joint disease, degenerative disc disease, osteoarthritis, and depressive disorder. (Tr. 19). The ALJ determined Plaintiff had the RFC to perform light work with the following restrictions: no more than occasional bending, stooping, kneeling, crouching, crawling, or climbing ramp/stairs; no climbing ladders, ropes, or scaffolds; a sit/stand option allowing the person to alternate sitting or standing positions throughout the work day without going off task; limited to simple, routine, and repetitive tasks in a low stress environment; no production line or pace work; and no more than occasional interaction with the public, co-workers, and supervisors. (Tr. 21).

The ALJ found Plaintiff partially credible. (Tr. 23). As support, he cited Plaintiff's non-

compliance with medication, lack of objective evidence, and Dr. Kothari's reports that Plaintiff was doing fine in terms of mood, affect, and behavior. (Tr. 23). The ALJ gave Mr. Woods' opinion limited weight. (Tr. 23). He noted Mr. Woods was not an acceptable medical source and assessed his opinion as an "other source" pursuant to Social Security Ruling (SSR) 06-3p, 2006 WL 2329939 (Aug. 9, 2006). In this regard, the ALJ found Mr. Woods' testimony was not fully supported by the medical evidence or other opinions in the record. (Tr. 23). Specifically, the ALJ found Mr. Woods' opinion inconsistent with Dr. Kothari's treatment notes. (Tr. 23-24). He also indicated determining whether an individual was disabled was an issue reserved for the Commissioner. (Tr. 24).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id*. The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) &

416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ failed to give appropriate weight to Mr. Woods' opinion as an "other source" pursuant to SSR 06-3p. Likewise, Plaintiff argues the ALJ was required to adopt physical therapist Brian Rafferty's FCE. Finally, Plaintiff argues the ALJ failed to meet his burden at step five of the sequential evaluation.

### **Opinions of "Other Sources"**

Medical opinions by licensed social workers and physical therapists are not considered "acceptable medical sources" that can establish whether a social security claimant has a "medically determinable impairment(s)." 20 C.F.R. §404.1513(a); *see Southward v. Comm'r of Soc. Sec.*, 2012 WL 3887212, *2 (E.D. Mich 2012). However, these "other sources" may be used as evidence "to show the severity of [a claimaint's] impairment(s) and how it affects [his] ability to work." §404.1513(d)(1). The regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources"; however, they do not explicitly address how to consider opinions and evidence from "other sources", including "non-medical sources" listed in §§404.1513(d) and 416.913(d). SSR 06-3p clarifies opinions from other sources "are important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06-3p, 2006 WL 2329939, at *3 (Aug. 9, 2006). SSR 06-3p also states other sources should be evaluated under the factors applicable to opinions from "acceptable medical sources" – i.e., how long the source has known and how frequently the source has seen the individual; consistency with the record evidence; specialty or area of expertise; how well the source explains the opinion; supportability; and any other factors that tend to support or refute the opinion. SSR 06-3p.

An opinion from an other source who has seen the claimant in his professional capacity may, under certain circumstances, properly be determined to outweigh the opinion of a medical source, including a treating source. SSR 06-3p (quotations omitted). For instance, this could occur if the other source has seen the individual more often and has greater knowledge of the individual's functioning over time, and if the opinion has better supporting evidence and is more consistent with the evidence as a whole. SSR 06-3p.

District courts in the Sixth Circuit vary widely in their interpretation of whether SSR 06-3p obligates an ALJ to discuss his reasons for not crediting opinions from "other sources." *See Southward*, 2012 WL 3887212, *2.[2] One line of cases provides that an "ALJ is not required to explain the weight given to the opinion of 'other sources', or to give reasons why such an opinion was discounted." *Ball v. Astrue*, WL 551136, at *5 (E.D. Ky. 2010); *see also Brewer v. Astrue*, 2012 WL 262632, at *10 (N.D. Ohio 2012) ("SSR 06-3p does not include an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'"); *Hickox v. Comm'r of Soc. Sec.*, 2010 WL 3385528, at * 7 (W.D. Mich 2010) ("SSR 06-3p does not require that an ALJ discuss opinions supplied by 'other sources' or to explain the evidentiary weight assigned thereto . . . . While [SSR] 06-3p certainly encourages ALJ's [sic] to evaluate each opinion in the record, regardless of its source, the ruling is not written in imperative form." (internal quotations omitted), *adopted* 2011 WL 6000829 (W.D. Mich. 2011). However, just as robust is a body of cases which hold that an ALJ is required assign weight and explain the weight accorded to an other source. *Sommer v. Astrue*, 2010

---

2. For complete description of cases see *Southward v. Comm'r of Soc. Sec.*, 2012 WL 3887212, *2 (E.D. Mich 2012).

WL 5883653, at *4 (E.D. Tenn. 2010) (holding remand required when "the ALJ failed to state he was rejecting [nurse practitioner's] opinion or provide some basis for rejecting the opinion" even while "acknowledg[ing] that it is not necessary to clear the same hurdle that must be surmounted to discount the opinion of a treating source").

*Mr. Woods - Social Worker*

Here, the ALJ addressed Mr. Woods' opinion and gave it limited weight. The ALJ also explained why he gave the opinion little weight – it was not fully supported by medical evidence or other opinions in the record, and it was not consistent with Dr. Kothari's treatment notes. The ALJ further explained the issue of disability was reserved to the Commissioner. Procedurally, under either body of cases concerning SSR 06-3p, the ALJ did not err. He not only assigned weight, he provided reasons touching upon several of the factors an ALJ may consider when evaluating "other sources" – treatment relationship, supportability, and consistency.

Plaintiff essentially argues the ALJ's reasons for discounting Mr. Woods' opinion were flawed. However, substantial evidence supports the ALJ's reasons for discounting Mr. Woods' opinion. First, Dr. Kothari's treatment notes showed Plaintiff was "doing fine" in terms of mood, affect, and behavior. (Tr. 375, 481, 494, 516, 552, 575, 586). Plaintiff also rarely reported new symptoms or complaints and his appointments were generally unremarkable. (Tr. 494, 516, 536, 552, 575, 586). These symptoms and clinical observations were noted even when Plaintiff stopped taking prescribed medication. (Tr. 481). Plaintiff also asserts the ALJ erred because he failed to reference Dr. Kothari's later treatment notes. However, an ALJ is not required to discuss every piece of medical evidence, especially when the evidence is duplicative. *Gammon v. Colvin*, 2013 WL 3814238, at *17 (M.D. Tenn. 2013); *see Walker v. Sec'y of Health and Human Servs.*, 884 F.2d 241,

245 (6th Cir. 1989). Dr. Kothari's treatment notes from March 2009 through November 2010 largely mirrored her treatment notes from 2008. (*Compare* Tr. 375-76 *with* Tr. 481, 494, 503, 516, 536, 552, 562, 575, 586). For instance, she continually noted Plaintiff was doing fine with respect to mood, affect, and behavior, despite occasional non-compliance with medication.

In addition, Mr. Woods accompanied Plaintiff to an appointment with Dr. Cola in 2010. Dr. Cola noted, "He had his social worker in the office with him [] and the social worker did not voice any concerns or have any problems either." (Tr. 455). Further, when questioned about his alleged disability during Dr. Brescia's evaluation, Plaintiff said he had a "bad left hip" and "got depressed"; however, he refused to take medication for his mental impairment because he "read up" on negative side effects. (Tr. 390-91). During that particular evaluation, Plaintiff said he was depressed because he could not find a job and his wife recently died. However, despite not taking medication, Plaintiff was clean, polite, and friendly, and had no trouble sleeping. (Tr. 392). Dr. Brescia also noted Plaintiff did not have delusional thinking or a thought disorder. (Tr. 394).

Mr. Woods' own treatment notes also showed Plaintiff was not as limited as he claimed. For instance, the notes reflected a dramatic fluctuation in Plaintiff's depressive symptoms. At times, Plaintiff had symptoms (Tr. 544, 555) and at times he had no symptoms (Tr. 579) or was stable (Tr. 589). Mr. Woods' notes also showed Plaintiff went fishing with his father or helped him with yard care. (Tr. 570). Mr. Woods was also aware Plaintiff performed odd jobs, including staining a deck and mowing grass for a neighbor. (Tr. 578). These instances, coupled with opinions from acceptable medical sources, support the ALJ's decision to discount Mr. Woods' opinion.

### *Mr. Rafferty – Physical Therapist*

Plaintiff briefly argues the ALJ erred in evaluating Mr. Rafferty's opinion because it was not

16

clear if the state agency physicians saw the FCE, and the VE testified Plaintiff could not work with the restrictions imposed by Mr. Lafferty.

The ALJ afforded Mr. Lafferty's opinion partial weight. (Tr. 24). He discounted the opinion because it did not reflect knowledge of the social security disability program and was inconsistent with the record. (Tr. 24). Despite opinions in the record indicating Plaintiff could perform medium work, the ALJ credited Plaintiff's allegations of back and hip pain in concluding Plaintiff could only perform a reduced range of light work with a sit/stand option. (Tr. 21). Importantly, Mr. Rafferty's FCE recommended "light and sedentary" work. (Tr. 437). Substantial evidence supports the ALJ's decision.

Dr. Lakhani's evaluation showed Plaintiff's gait and ambulation were normal without ambulatory aids. (Tr. 381). Despite moderate tenderness, Plaintiff's straight leg testing was negative. (Tr. 382). There was no muscle wasting or sensory loss, deep tendon reflexes were 5/5 in the lower extremities, and x-rays showed only minimal degenerative changes. (Tr. 382). During a 2010 appointment at Salem, Plaintiff had no back pain, joint stiffness, joint swelling, or swelling of extremities. (Tr. 447). He had normal posture, gait, and sensation in his lower extremities. (Tr. 449). Further, during an appointment with Dr. Cola in 2010, Plaintiff had energy and was doing well overall. (Tr. 455). Notably, Plaintiff did not take prescribed pain medication during his alleged disability period for hip or back pain, and he testified Aleve helped his pain. (Tr. 53). Indeed, Plaintiff performed numerous activities without the aid of pain mediation, which showed he was not as limited as he claimed. For instance, Plaintiff performed odd jobs, including staining a deck and mowing a neighbor's grass once a week. (Tr. 49, 379, 578). Plaintiff also occasionally went fishing, searched for jobs, and grocery shopped independently. (Tr. 381, 395-96). Plaintiff's conservative

17

treatment measures coupled with daily activity and unsupportive clinical evidence support the ALJ's RFC determination and decision to discount Mr. Rafferty's opinion.

Likewise, Plaintiff argues the ALJ erred because he did not rely on VE testimony indicating Plaintiff could not work given Mr. Rafferty's limitations. However, if an ALJ relies on VE testimony in response to a hypothetical, that hypothetical must accurately portray the claimant's limitations. *Ealy*, 594 F.3d at 516-17. "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). As noted above, substantial evidence supported the ALJ's RFC determination and discounting of Mr. Lafferty's opinion. Therefore, the ALJ did not err at step five, as he was required to incorporate only those limitations he accepted as credible.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds substantial evidence supports the ALJ's decision. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

           s/James R. Knepp, II
           United States Magistrate Judge